UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

SUDENGA INDUSTRIES,
INCORPORATED,

                    Plaintiff,

v.                                                    Case No. 18-2498-DDC

GLOBAL INDUSTRIES, INC.,

                    Defendant.

## **ORDER**

This is a patent-infringement case.  The plaintiff, Sudenga Industries, Inc., has filed a motion seeking to compel supplemental discovery responses from the defendant, Global Industries, Inc. (ECF No. 110).  Plaintiff's motion challenges the withholding of documents by defendant based on assertions of attorney-client privilege and work-product protection. Defendant opposes the motion to compel, arguing the documents were properly withheld. For the reasons discussed below, the court grants the motion in part and denies the motion in part.

Background

Plaintiff alleges defendant's NexGen 3000, a bin sweep system, infringes two of plaintiff's patents.   Prior to filing this lawsuit, plaintiff sent an initial letter to Hutchinson/Mayrath, the trade named used by defendant for its grain handling business.[1]

_____

[1] ECF No. 117 at 4.

The letter notified defendant of plaintiff's patent-infringement allegations.[2]  Defendant is a member company of the Canadian company AGI, which acquired defendant's outstanding shares in 2017.[3]  Ryan Kipp, the attorney whose communications are primarily at issue in this dispute, has served as AGI's General Counsel during all relevant times.[4]  He works out of AGI's offices in Winnipeg, Canada, and is registered and licensed in several Canadian Law Societies.[5]  He isn't licensed to practice law in the United States.

Plaintiff served its fourth request for production on September 30, 2019.  Defendant served written responses on November 3, 2019 but didn't produce any responsive documents.  Over the next four months, the parties conferred extensively over how to resolve the discovery dispute.[6]  Defendant served a privilege log with one entry,[7] then later served a second privilege log with entries 2 -268.  Many of these entries are now the subject of the parties' dispute.  The parties conferred again regarding the disputed items and defendant agreed to produce some of the documents.  However, the parties did not reach an agreement on many of the documents.

---

[2] *Id.*

[3] *Id.*

[4] *Id.*

[5] *Id.*

[6] *See* ECF No. 110.

[7] ECF No. 117 at 7.

Plaintiff filed the instant motion on March 23, 2020, arguing these documents are relevant to summary-judgment briefing.   With the exception of resolving plaintiff's discovery motion, the undersigned U.S. Magistrate Judge, James P. O'Hara, has stayed all pretrial proceedings until both parties' motions for summary judgment (i.e., the motion defendant filed on April 10, 2020 (ECF No. 118), and the motion plaintiff has until July 1, 2020 to file) are decided by the presiding U.S. District Judge, Daniel D. Crabtree.[8]

For length, the court will summarize but not reproduce each interrogatory and request for production in full, as they can be found in the parties' briefing.  After addressing the overarching issues, the court will generally adhere to the categories offered by plaintiff to discuss the requests for production and will address individual requests as needed.

As a threshold matter, the court first considers whether the parties have sufficiently conferred regarding plaintiff's motion, as required by D. Kan. R. 37.2.  A review of the briefing and attached exhibits indicates counsel communicated via e-mail and telephone multiple times to attempt to resolve their discovery disputes.[9]  As such, the court is satisfied counsel have adequately conferred for the purposes of the motion to compel.

Analysis

First, defendant argues plaintiff's motion is untimely.  Defendant served its updated privilege log on January 15, 2020.  D. Kan. R. 37.1(b) requires that a motion to compel "must be filed and served within 30 days of the default or service of the response, answer,

---

[8] ECF No. 125.

[9] ECF No. 110 at 6-7.

or objection that is the subject of the motion."  Because plaintiff didn't file its motion to compel until March 23, 2020, defendant argues the motion to compel is untimely.

The court, exercising its inherent discretion, declines to deny plaintiff's motion to compel on the basis of this filing date.  Plaintiff argues its motion was properly filed before the April 27, 2020 deadline for non-dispositive motions and with "an agreement by the parties to extend deadlines for motions to compel under the Local Rule 37.1(b)."[10] Defendant appears to interpret the third amended scheduling order differently, arguing that scheduling order shortened the time to file a motion to compel on discovery taken less than 30 days before April 27, 2020, but did not suspend or extend Rule 37.1 generally.[11]  The court accepts plaintiff's understanding that it was permitted to file the motion to compel until April 27, 2020.  Further, the court believes the parties' ongoing efforts to confer demonstrate an understandable justification for plaintiff's delay in moving to compel.[12] The record reflects both parties "provided lengthy emails with detailed legal analysis as part of their effort to reach a compromise or resolution."[13]   The court is satisfied plaintiff timely filed the motion to compel.

---

[10] ECF No. 122 at 3.

[11] ECF No. 117 at 10.

[12] ECF No. 122 at 4.

[13] *Id.* at 3.

Waiver

Plaintiff categorizes the types of documents at issue in its motion. The final category encompasses entries 2-268, all entries that weren't on defendant's original privilege log. Plaintiff argues defendant waived privilege of all documents because defendant didn't specifically allege attorney-client privilege when it served its written discovery responses or produced documents and only asserted privilege on January 15, 2020. Plaintiff alleges this waiver of privilege would apply to all new entries in the second privilege log.[14]

Defendant produced its privilege log on the date required by Local Patent Rule 3.6(c), which directs parties to serve a privilege log within 42 days of the court's claim construction order.[15] Judge Crabtree entered his claim construction ruling on December 4, 2019.[16] Based on the ongoing production of documents, the undersigned magistrate judge agrees defendant has not waived privilege based on the date of its updated privilege log.

Plaintiff concedes that the court granting leave for this motion means "the delay in serving the updated privilege log did not result in waiver for all Category V documents."[17] The court concludes, as plaintiff suggests, "that *both parties* understood the court's scheduling orders to be controlling as to the various deadlines that applied in both

---

[14] ECF No. 110 at 25.

[15] D. Kan. Patent Local R. 3.6(c).

[16] ECF No. 102.

[17] ECF No. 122 at 14.

directions, meaning plaintiff's present motion is timely but so was defendant's service of its updated privilege log."[18]   The court concludes defendant's privilege log was timely produced.

Foreign Attorney

The court must resolve whether whether attorney-client privilege can apply to Kipp in his role as Canadian in-house counsel, before turning to the specific categories of documents plaintiff introduces.   Plaintiff argues any documents involving Kipp must treated as being with a non-attorney because Kipp was not licensed or authorized to provide legal advice on United States law.[19]   Plaintiff's position is that, because a U.S. company chose not to retain U.S. counsel, it cannot invoke privilege.[20]

Defendant, on the other hand, asks the court to hold that work by an in-house Canadian lawyer to provide legal advice regarding a cease-and-desist or notice letter from a U.S. company regarding U.S. patents is covered by the attorney-client privilege.[21]   The parties both note the lack of American case law on this issue, but cite both American and Canadian case law and scholarly articles.   Plaintiff raises a choice-of-law analysis, given

---

[18] *Id.*

[19] In its motion, plaintiff invokes the crime-fraud waiver argument and arguably insinuates Kipp has engaged in the unauthorized practice of law.   Plaintiff's reply clarifies "it has not called Mr. Kipp a criminal" and "the court is not being asked to rule on the unauthorized practice of law under state law."   ECF No. 122 at 8 n.3.   Given the parties' ultimate positions, the court declines to address this argument further.

[20] ECF No. 122 at 9.

[21] ECF No. 117 at 12.

the cross-border activities at issue here.  Defendant frames the relevant analysis as "more directly a question regarding the outer legal bounds of privilege for an in-house attorney in cross-border (U.S.-Canada) situations."[22]

Choice of Law

Questions of privilege are governed by the principles of common law.  Plaintiff argues United States privilege law applies here.  "[I]t is important to note that the present dispute is not a complicated cross-border matter in which multiple related disputes in multiple countries are involved.  Rather, this is purely a U.S. dispute involving a U.S. company, exclusively U.S. activities, and exclusively U.S. patent laws."[23]

The parties point out that no Tenth Circuit case law has addressed a similar issue. The court looks to the Second Circuit, a circuit more familiar with issues arising from patent litigation, for guidance.  Courts in the Second Circuit use the "touch base" approach, applying "the law of the country that has the predominant or the most direct and compelling interest in whether the communications should remain confidential, unless that foreign law is contrary to the public policy of this forum."[24]   Generally, the country with the

---

[22] *Id.* at 5.

[23] ECF No. 122 at 10.

[24] *Wultz v. Bank of China Ltd.*, 979 F. Supp. 2d 479, 486 (S.D.N.Y. 2013), *on reconsideration in part*, No. 11 CIV. 1266 SAS, 2013 WL 6098484 (S.D.N.Y. Nov. 20, 2013); *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 64–65 (S.D.N.Y. 2010).

predominant issue is "the place where the allegedly privileged relationship was entered into."[25]

Defendant does not explicitly oppose the assertion that United States law should be applied but also cites Canadian case law and scholarship to support its argument that Canadian law would also provide for attorney-client privilege under these circumstances. The court agrees that ultimately this is not the crux of the issue. The court agrees American case law governs, but the standards of Canadian attorney requirements are relevant for the analysis.

Given the novelty of the issues, the court looks to both the Tenth Circuit and Kansas attorney-client privilege standards. The Tenth Circuit defines attorney-client privilege as follows:

> The attorney-client privilege protects confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor. The mere fact that an attorney was involved in a communication does not automatically render the communication subject to the attorney-client privilege; rather, the communication between a lawyer and client must relate to legal advice or strategy sought by the client.[26]

In Kansas, attorney-client privilege is defined to cover:

> [C]ommunications found by the judge to have been between an attorney and such attorney's client in the course of that relationship and in professional confidence, are privileged, and a client has a privilege: (1) If such client is the witness, to refuse to disclose any such communication; (2) to prevent

---

[25] ECF No. 117 at 5.

[26] *Ad Astra Recovery Servs., Inc. v. Heath*, No. 18-1145-JWB, 2019 WL 1753958, at *2 (D. Kan. Apr. 19, 2019) (citing *In re Grand Jury Proceedings*, 616 F.3d 1172, 1182 (10th Cir. 2010)).

such client's attorney from disclosing it; and (3) to prevent any other witness from disclosing such communication if it came to the knowledge of such witness (i) in the course of its transmittal between the client and the attorney, (ii) in a manner not reasonably to be anticipated by the client or (iii) as a result of a breach of the attorney-client relationship.[27]

Kansas law defines attorney to include "a person authorized, or reasonably believed by the client to be authorized, to practice law in any state or nation, the law of which recognizes a privilege against disclosure of confidential communications between client and attorney."[28]

Defendant has made a sufficient showing that Kipp falls within this definition. Kipp is a registered barrister and solicitor in Canada.[29] He is admitted to practice law in the Alberta and Manitoba providences of Canada.[30] He is a member of the Legal Societies of three Canadian provinces.[31] He is governed by these legal societies, as well as the Canadian Bar Association.[32] The court concludes Kipp is a legal advisor for the purposes of its analysis.

---

[27] Kan. Stat. Ann. § 60-426(c)(3).

[28] *Id.*

[29] ECF No. 117-2 at 3.

[30] *Id.*

[31] *Id.*

[32] *Id.*

<u>Professional Capacity as Such</u>

Plaintiff concedes Kipp may fall within the Kansas state law definition of "attorney," but argues that doesn't mean the communications were provided *"in his professional capacity as such."*[33]  Essentially, plaintiff argues because Kipp isn't licensed to practice in America, he hasn't been giving professional legal advice.

<u>Exclusive Counsel</u>

Specifically at issue is the fact that defendant employed Kipp as exclusive outside counsel for a period of time.  Defendant had U.S.-licensed counsel retained in 2016 and again in 2018, but there appears to be a period of months in 2017 when defendant did not have U.S.-licensed counsel.[34]  Plaintiff argues this is different from a situation where a foreign attorney needs to gather initial information to determine which jurisdiction's law applies; rather, this is a yearlong "conscious decision to forego privilege."[35]

Defendant does not oppose that characterization but disputes that it is dispositive to the attorney-client privilege analysis. Defendant argues policy considerations favor allowing privilege to apply to attorneys from other countries where they have similar professional conduct obligations.  "If the rule is that a non-U.S. company who receives a cease-and-desist or patent notice letter must immediately retain outside U.S. counsel rather than relying on its own in-house lawyer for legal guidance, then that will lead to increased

---

[33] ECF No. 122 at 9 (emphasis included).

[34] ECF No. 110 at 8.

[35] ECF No. 122 at 9.

costs and complexity – for no reason.  In contrast, there is no harm from AGI's conduct here."[36]

The court is not persuaded that the lack of U.S. counsel during the period of time is dispositive.  Plaintiff, who cites *Gucci Am., Inc. v. Guess?, Inc.* for the proposition that American law should be applied, argues that *Gucci* also supports the conclusion that communications with a foreign counsel are not privileged during a period of time when he did not act as an agent of a U.S.-licensed attorney.[37]  But there, the agent was not an attorney, a distinction the court made clear.  The issue was whether he was a licensed professional at all; the court used the standard of "whether the third-party agent is supervised directly by an attorney and whether the communications were intended to remain confidential."[38]  The court disagrees with plaintiff's conclusion that "the lack of involvement of a licensed U.S. attorney for matters that 'touched base' with U.S. law was fatal to certain attorney-client privilege claims."[39]

<u>Membership in a Bar</u>

Defendant cites *Renfield Corp. v. E. Remy Martin & Co, S.A.* as "apparently the only reported case to have addressed this issue."[40]  There, the court held that attorney-client

---

[36] ECF No. 117 at 13.

[37] ECF No. 110 at 10.

[38] *Gucci Am., Inc. v. Guess?, Inc.*, 271 F.R.D. 58, 72 (S.D.N.Y. 2010).

[39] ECF No. 110 at 10.

[40] ECF No. 117 at 13.

privilege applied to the French in-house counsel.  Because the French did not have an equivalent to the American bar, the requirement instead was "a functional one of whether the individual is competent to render legal advice and is permitted by law to do so."[41] Under that analysis, the French in-house counsel met the test and were protected by the attorney-client privilege.

Plaintiff correctly asserts that later decisions by courts in the Second Circuit have declined to apply the *Renfield* "functional equivalent" test.  But one of the courts that did so specifically invoked the rule as justifying "the protection of the attorney-client privilege for circumstances where a lawyer—whose authority derives from her position as a member of the bar—is engaged to provide legal advice."[42]  Indeed, U.S. Magistrate Judge James L. Cott, who decided *Gucci*, wrote, "As I discussed in *Gucci America v. Guess*, attorney-client privilege requires a showing 'that the person to whom the communication was made "is a member of the bar of a court."'"[43]  Judge Cott and other New York judges have distinguished between countries where in-house counsel are not required to be members of a bar or have some form of legal credentials, such as China or the Netherlands, and those where they are.[44]

---

[41] *Renfield Corp. v. E. Remy Martin & Co, S.A.*, 98 F.R.D. 442 (D. Del. 1982).

[42] *Wultz v. Bank of China Ltd.*, 979 F. Supp. 2d 479, 495 (S.D.N.Y. 2013), *on reconsideration in part*, No. 11 CIV. 1266 SAS, 2013 WL 6098484 (S.D.N.Y. Nov. 20, 2013).

[43] *Id.*

[44] *Id.*; *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 117, 119 (S.D.N.Y.), *aff'd*, 982 F. Supp. 2d 260 (S.D.N.Y. 2013) (explaining there was no recognized Dutch law for

Plaintiff relies on *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer, Inc.*, which held certain communications about a patent application were not privileged.  The in-house counsel there was a French patent agent.[45]  As plaintiff points out, the court did cite the patent agent's lack of license to practice law in the United States.[46]  Notably, though, the court also cited the content of the documents – the patent application was not legal advice, and legal services were not sought from the patent agent or the United States patent attorney who was involved.[47]  And importantly, *Bristol-Myers Squibb Co.* involved Swiss law that "specifically exclude[d] the documents at issue from the privilege it recognize[d]."[48]  Therefore, this court doesn't construe *Bristol-Myers Squibb Co.* to hold that any communications involving people not entitled to practice law in the United States is incapable of being privileged.

Specifically regarding Canada, American courts have extended a patent-agent privilege to Canadian patent agents who are attorneys and acting in that capacity.[49]

---

unlicensed lawyers but there was a "legal professional privilege" for licensed in-house counsel).

[45] *Bristol-Myers Squibb Co. v. Rhone-Poulenc Rorer Inc.*, No. 95 CIV. 8833 (RPP), 1998 WL 957054, at *4 (S.D.N.Y. Aug. 11, 1998).

[46] *Id.*

[47] *Id.*

[48] *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 78 (S.D.N.Y. 2006), *abrogated on other grounds by In re Queen's Univ. at Kingston*, 820 F.3d 1287 (Fed. Cir. 2016).

[49] *Saxholm AS v. Dynal, Inc.*, 164 F.R.D. 331, 338 (E.D.N.Y. 1996) (applying privilege to communications made by the patent agents "while they were acting in their capacity as lawyers").

Plaintiff repeatedly cites a 2006 Southern District of New York case, *In re Rivastigmine Patent Litig.*, 237 F.R.D. 69, 74 (S.D.N.Y. 2006).  Plaintiff compares Kipp, as a non-U.S.-licensed attorney, to a patent agent, and argues "the basic principles are the same for attorneys and patent agents authorized to practice (patent prosecution) law."[50]  Yet, as defendant correctly notes, *Rivastigmine* was abrogated in part by a 2016 case involving a Canadian university, which explicitly held a patent agent-client privilege does exist under U.S. law.[51]

Similarly, plaintiff cites *In re Silver*, 540 S.W. 3d 530 (Tex. Sup. Ct. 2018) in support of its argument that privilege doesn't apply when communications are "not necessarily made to facilitate the rendition of professional legal services."[52]  The court agrees our analysis must contain an evaluation of whether legal services are provided, as compared to primarily business services.  The court addresses this element later.  But *In re Silver* also offers a fairly comprehensive discussion about who fits the definition of "lawyer" and the difference between being "authorized" and "being licensed" to provide legal services.  For the purposes of our analysis, this discussion is instructive.  The Texas Supreme Court explained that "authorized" means "sanctioned by authority" or "approved" – distinct from "licensed," meaning "permitted or authorized by licensed."  That court

---

[50] ECF No. 122 at 8.

[51] *In re Queen's Univ. at Kingston,* 820 F.3d 1287 (Fed. Cir. 2016).

[52] ECF No. 110 at 20.

specifically concluded: "if the drafters intended for the lawyer-client privilege to apply only to licensed attorneys, they knew how to say that."[53]

In the context of the Texas rules, the court concluded privilege was more limited because the drafters chose to say licensed.  But applying this logic to the Kansas attorney-client privilege language, the case plaintiff cites seems to suggest the Kansas language of "authorized" suggests something broader than those who are licensed in a state or nation.  By that definition, Kipp clearly is a person authorized to practice law in any state or nation, the law of which recognizes a privilege against disclosure of confidential communications between client and attorney.

Defendant has shown Canadian attorneys have to have a similar licensing as U.S. attorneys, and Kipp is licensed accordingly.  Based on the record, the court concludes Kipp was acting as a professional legal advisor in his work as in-house counsel.  After finding that attorney-client privilege may apply to Kipp, the court turns to the remaining arguments as related to the specific categories of documents.

<u>Category 1: Documents Authored or Received by Kipp</u>

The first and largest group of documents are documents authored or received by Kipp listed as the only attorney.  Plaintiff argues attorney-client privilege does not apply for two main reasons: (1) Kipp is not licensed to practice law in the United States and (2)

---

[53] *In re Silver*, 540 S.W.3d 530, 538 (Tex. 2018).

the documents relate to business advice, rather than legal advice.  Having already resolved the first question, the court turns to the second.

Plaintiff argues these documents "do not reflect legal advice sought by Global from Kipp in a professional legal capacity (i.e., they are not "from a professional legal advisor in his capacity as such") but instead relate to business advice and/or business decisions."[54] Defendant argues the communications involve legal advice concerning "Sudenga's allegation of infringement, its potential ramifications, and how to best address that allegation from a legal perspective."[55]

Of course, the privilege doesn't apply "to every interaction between attorney and client."[56] There must be a connection between "the subject of the communication and the rendering of legal advice" for the attorney-client privilege to shield the communication from disclosure.[57]  Legal advice must predominate for the communication to be protected, i.e., the privilege does not apply where the legal advice is merely incidental to business

---

[54] ECF No. 110 at 18.

[55] ECF No. 117 at 17.

[56] *Cypress Media, Inc. v. City of Overland Park*, 997 P.2d 681, 690 (Kan. 2000).

[57] *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, 586 F. Supp. 2d 1250, 1269 (D. Kan. 2008).

advice.[58]  The privilege only protects the disclosure of communications, not disclosure of the underlying facts by those who communicated with the attorney.[59]

Attorney-client privilege does protect communications with in-house counsel.[60]  A party may demonstrate the privilege applies to communications among corporate management employees by "establishing that the communication was made in confidence for the primary purpose of obtaining legal advice."[61]  But business data or documents where the element of confidentiality is lacking, for example, would not be protected under attorney-client privilege. [62]

Courts look closely to the advice given in the in-house capacity.  "When the attorney serves also in another capacity, such as vice president, his advice is privileged 'only upon a clear showing' that it was given in a professional legal capacity."[63]  The Northern District of Oklahoma has set forth a rebuttal presumption that, while not binding, is instructive:

> Many courts have relied on two rebuttable presumptions (though often not stated expressly) regarding the role of the lawyer in determining the nature of the advice: (1) if outside counsel is involved, the confidential communication is presumed to be a request for and the provision of "legal advice"; and (2) if in-house counsel is involved, the presumption is that the

---

[58] *Id.*

[59] *Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2014 WL 1309095, at *6 (D. Minn. Apr. 1, 2014).

[60] *New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 425 (D. Kan. 2009).

[61] *White*, 586 F. Supp. 2d at 1269.

[62] *Black & Veatch Corp.*, 297 F.R.D. 611, 620 (D. Kan. 2014).

[63] *Marten v. Yellow Freight Sys., Inc.*, No. CIV. A. 96-2013-GTV, 1998 WL 13244, at *6 (D. Kan. Jan. 6, 1998).

attorney's input is more likely business than legal in nature. As a result, most of these courts apply "heightened" scrutiny to communications to and from in-house counsel in determining attorney-client privilege.[64]

For example, the privilege does not protect "general topics of attorney-client discussions" or ultimate "legal conclusions."[65]   This court held that information between in-house counsel with company executives regarding alleged infringement was not privileged communication.[66]

One of Kipp's responsibilities in his role is to give legal advice as General Counsel.[67]   Kipp has submitted an affidavit stating on March 20, 2017, defendant received a letter from plaintiff's counsel alleging patent infringement of the asserted patents by defendant's accused device.[68]   Although the letter was addressed to Brian Thomas, the engineering manager at Hutchinson/Mayrath, Kipp began to assist in defendant's response once AGI acquired defendant in April 2017.[69]

---

[64] *Lindley v. Life Inv'rs Ins. Co. of Am.*, 267 F.R.D. 382, 389 (N.D. Okla. 2010), *aff'd in part as modified*, No. 08-CV-0379-CVE-PJC, 2010 WL 1741407 (N.D. Okla. Apr. 28, 2010).

[65] *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2017 WL 2555834, at *2 (D. Kan. June 13, 2017).

[66]  *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*, No. 11-2684-JWL, 2014 WL 545544, at *8 (D. Kan. Feb. 11, 2014).

[67] ECF No. 117 at 16.

[68] ECF No. 117-2 at 3.

[69] *Id.* at 4.

Some communications were with engineers who were familiar with the accused device.  He asserts there was at that point "the apparent real possibility of ensuing litigation"[70]  and the anticipation that "plaintiff may file a patent infringement lawsuit at any time."[71]  Kipp asserts, if not for plaintiff's charge of infringement in that letter, he would not have asked Craig Nimegeers, the Vice President of Engineering for Portable Handling & Conditioning at AGI, to conduct a patent analysis.[72]

Another segment of communications was with senior management.  Kipp summarized the status of the product and patent review, in addition to advising of the legal issues and effects implicated by the March 20 letter.[73]

Ultimately, the court cannot ascertain whether attorney-client privilege applies to each entry on the log.  The descriptions are limited to broad language, most often "e-mail chain reflecting privileged attorney-client communication and attorney work-product regarding allegations of patent infringement."  The court, as evidenced by its earlier analysis, is not foreclosing the possibility that these communications may be protected by attorney-client privilege.  But the language on the privilege log provided does not clarify whether the communications are, in fact, legal communications or business communications.

---

[70] *Id.*

[71] *Id.*

[72] *Id.* at 5.

[73] *Id.*

Notwithstanding this ruling, defendant previously offered – and continues to offer – to produce a number of entries, on the condition plaintiff "agreed to not leverage that production into a subject-matter waiver argument."[74]   Although defendant maintained its privilege objections for the purposes of the motion, it maintains it will produce "entries 12–14, 57, 58, 70, 71–74, 84–86, 89, 90–93, 95-100, 102–10, 136, 137, 143, 144, 148, 149, 150, 161, 162, 166, 167, 203–04, 234, 235–40, and 256–61.   Defendant is directed to do so.

Category 2: Work-Product Protection

Category 2 is a subset of Category 1 documents for which defendant asserts work-product protection, in addition to attorney-client privilege.   Defendant previously agreed to produce a number of these documents within these categories.[75]   The court directs defendant to produce log entries 12–14, 86, 94[76] –100, 126, 167, 234–40, and 256–61, pursuant to that agreement.

Defendant continues to object to the four remaining log entries.   As to entries 7 and 252, defendant represents this chain contains an e-mail analyzing defendant's product relative to plaintiff's patents that was prepared in anticipation of litigation as part of Kipp's analysis.[77]   For entries 7, 142, and 255, defendant asserts these documents include requests

---

[74] ECF No. 117 at 11.

[75] *Id.* at 18.

[76] Defendant has withdrawn its work-product objection for Doc No. 94.  *See id.*

[77] *Id.*

for legal advice, the legal advice itself, and Kipp's analysis of the possible impact of Sudenga's infringement charge.[78]

Plaintiff argues "it is not clear that these materials were created in anticipation of litigation . . . particularly when no lawsuit had been filed and when Mr. Ryan Kipp indicated by letter on Sept. 17, 2017 that Global wished to take a license under Sudenga patents, indicating that these materials had a business purpose."[79] Plaintiff argues these communications weren't prepared in anticipation of litigation or for trial; rather "negotiation and associated business decision-making was involved."[80]

The work-product doctrine prevents disclosure of information that was prepared by an attorney in anticipation of litigation or for trial.[81]   This requires more than a mere possibility of litigation.[82]   Defendant, as the party asserting the privilege, has the burden of establishing its application to each document.[83]   It must show "(1) the materials sought to be protected are documents or tangible things; (2) they were prepared in anticipation of litigation or for trial; and (3) they were prepared by or for a party or a representative of that

---

[78] *Id.*

[79] ECF No. 110 at 22.

[80] *Id.*

[81] *In re Grand Jury Proceedings*, 616 F.3d 1172, 1184–85 (10th Cir. 2010).

[82] *Better v. YRC Worldwide Inc.*, No. 11-2072-KHV, 2015 WL 11142863, at *4 (D. Kan. Sept. 23, 2015).

[83] *Id.*

party."[84] The court evaluates both whether the documents in question were created *because* of the anticipation of litigation and whether the party reasonably believed the threat of litigation to be real and imminent. Generally, documents created "in the ordinary course of business or for other non-litigation purposes are not protected" under the work-product privilege.[85]

Defendant's showing is sufficient to sustain the assertion of the work-product privilege. Its privilege log includes the dates they were prepared, the identities of the people who created the documents, and the bases of the objections for withholding discovery of the documents.[86] The privilege descriptions, combined with the supplemental information in the briefing, are sufficient. The analysis contained in these documents was made in response to the March 20, 2017 letter from plaintiff's outside litigation counsel, which stated it was entitled to bring a patent infringement suit to enforce its patent rights. The language in the March 20, 2017 letter goes beyond a possibility of litigation and specifically invokes plaintiff's entitlement to litigation and the anticipation of litigation, if the license was not agreed upon.[87] "But for Sudenga's accusation of infringement, and the possibility of litigation that logically follows from that accusation, Mr. Nimegeers would

---

[84] Fed. R. Civ. P. 26(b)(3); *Kannaday v. Ball*, 292 F.R.D. 640, 648 (D. Kan. 2013).

[85] *Kannaday v. Ball*, 292 F.R.D. at 648.

[86] *Id.* (citing *In re Universal Serv. Fund Tel. Billing Practices Litig.*, 232 F.R.D. 669, 673 (D. Kan. 2005)).

[87] ECF No. 117-1 at 2.

not have undertaken this analysis."[88]   The court agrees defendant prepared these documents "reflecting analysis of Sudenga's patents relative to the accused products and the prior art, in reasonable anticipation of potential litigation."[89]   The court finds defendant has adequately asserted work-product protection for these four entries.

Category 3: Communication with AGI Employees

Category 3 contains another subset of Category 1 documents, ones where the communication was with other AGI employees.  Plaintiff argues that any privilege would have been waived by the presence of third-parties.[90]  Plaintiff argues that because AGI is a separate company from Global, the privilege doesn't extend to their communications.[91]

Defendant has offered to produce many of these log entries, which the court directs defendant to do: 57, 58, 70–72, 74, 89–93, 136, 137, 139, 143, 144, 148, 149, 150, 161, 162, and 166.[92]  As to the remaining documents, defendant asserts they are all e-mail chains or documents created by and between AGI employees.  As mentioned earlier, AGI is the parent company of Global.[93]   Defendant identifies the roles of each person in the communication: the President and CEO of AGI; the Executive Vice President and Chief

---

[88] ECF No. 117 at 19.

[89] *Id.* at 20.

[90] ECF No. 110 at 24.

[91] *Id.* at 24.

[92] ECF No. 117 at 22.

[93] ECF No. 110 at 8.

Financial Officer of AGI; the Vice President of Engineering for Portable Handling & Conditioning at AGI; counsel at AGI; and a paralegal at AGI.[94]

The court agrees these are "communications solely within AGI"[95] and therefore privilege has not been waived based on communication with third-parties. Considering the structure of the company and the roles of the employees, these are not third-parties for the purposes of waiver of privilege. These are employees of the same entities. But even if they are employees of a separate employer, the court construes them as third-parties for whom disclosure was necessary to obtain informed legal advice.[96] The commonality of interest shared among AGI employees for the purpose of these communications is strong enough not to destroy the attorney-client privilege.[97]

In accordance with the court's ruling as to attorney-client privilege attaching to Canadian attorneys, the court will rule the same way here and find privilege may attach to the remaining Category 3 documents, but the court cannot determine that at this stage. If defendant intends to maintain its privilege objections, these documents should be included in the revised privilege log.

---

[94] ECF No. 117 at 22-23.

[95] *Id.* at 22.

[96] *Lawson v. Spirit AeroSystems, Inc.*, No. 18-1100-EFM-ADM, 2020 WL 1643679, at *5 (D. Kan. Apr. 2, 2020); *Roe v. Catholic Health Initiatives Colorado*, 281 F.R.D. 632, 637 (D. Colo. 2012) ("The attorney-client privilege can extend to communications between representatives of the client or between the client and a representative of the client, if the communication was made in confidence for the primary purpose of obtaining legal advice.").

[97] *Roe v. Catholic Health Initiatives Colorado*, 281 F.R.D. 632, 637 (D. Colo. 2012).

Category 4: Documents Referring to Unnamed Attorney

Defendant has offered to produce many of these log entries, which the court directs defendant to do for entries 5, 6, 53, 116–23, 156–59, 253, and 254.[98]  Two documents remain.  For entry 87, two attorneys are listed: Kipp and outside counsel, John Myers. Plaintiff maintains that there is no evidence Myers is a U.S.-licensed attorney and the same issues apply to him that apply to Kipp.[99]  Based on Kipp's affidavit, John Myers is a Canadian attorney serving as outside counsel with the firm Taylor McCaffrey.[100] Defendant has clarified entry 145 was created by the Vice President of Engineering for Portable Handling and Conditioning, at the request of Kipp.[101]

In accordance with the court's ruling as to attorney-client privilege attaching to Canadian attorneys, the court will rule the same way here.  Privilege may attach to entries 87 and 145, but the court cannot determine it at this stage.  If defendant intends to maintain its privilege objections, these documents should be included in the revised privilege log.

Privilege Log

The undersigned's experience with past *in camera* reviews of purportedly privileged documents suggests that lawyers, for a variety of reasons, tend to be far too aggressive with their privilege assertions – seldom are more than 20% of those documents actually entitled

---

[98] ECF No. 117 at 22.

[99] ECF No. 122 at 13.

[100] ECF No. 117 at 24.

[101] *Id.*

to protection. The court is inclined to streamline the documents for which the privileges continue to be asserted in light of this order.  The court is hopeful its analysis in this order will guide the parties in determining which documents truly are disputed.  Defendant has agreed to produce a large percentage of the documents already.  It is entitled to continue to assert privileges to the extent it has a good-faith basis to do so.  But the court will require a revised privilege log to require defendant to ensure it conforms to the court's high standards of applying privilege.  Defendant is required to prepare, within two weeks of this order, a new privilege log that conforms to this analysis.

The court will restate the standard here to remind the parties what the court considers protected.  The court must be able to determine whether *each element* of the asserted privilege is satisfied.  The following information must be included:

1. A description of the document explaining whether the document is a memorandum, letter, e-mail, etc.;

2. The date upon which the document was prepared;

3. The date of the document (if different from # 2);

4. The identity of the person(s) who prepared the document;

5. The identity of the person(s) for whom the document was prepared, as well as the identities of those to whom the document and copies of the document were directed, "including an evidentiary showing based on competent evidence supporting any assertion that the document was created under the supervision of an attorney;"

6. The purpose of preparing the document, including an evidentiary showing, based on competent evidence, "supporting any assertion that the document was prepared in the course of adversarial litigation or in anticipation of a threat of adversarial litigation that was real and imminent;" a similar evidentiary showing that the subject of communications within the document relates to seeking or giving legal advice; and a showing, again based on

26

competent evidence, "that the documents do not contain or incorporate non-privileged underlying facts;"

7. The number of pages of the document;

8. The party's basis "for withholding discovery of the document (i.e., the specific privilege or protection being asserted); and

9. Any other pertinent information necessary to establish the elements of each asserted privilege.[102]

Upon its review of defendant's updated privilege log, the court calls attention to element #6.  The privilege log, as submitted, contains entries that do not clearly state a protected purpose.  For example, most of the entries contain the same language that the document or e-mail chain "reflects attorney-client communications regarding allegations of patent infringement."   The court is mindful of defendant's intention not to reveal privileged information, but these generic descriptions do not reflect any evidentiary showing of seeking or giving legal advice. The court reminds the parties that the attorney-client privilege protects the substance of a communication between counsel and client but does not apply to the *fact* that such communications took place.[103]  The court also directs the parties to carefully review the earlier sections describing the scope of attorney-client privilege and work-product protection.

---

[102] *New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 448–49 (D. Kan. 2009).

[103] *Plaza Ins. Co. v. Lester*, No. 14-CV-01162-LTB-CBS, 2015 WL 3528336, at *6 (D. Colo. June 4, 2015).

At the risk of stating the obvious, although the court is exercising its discretion and giving defendant a second chance to prepare a sufficient privilege log, it would be imprudent for defendant and esteemed counsel to assume the court would ever give them a third chance.  In the hopefully unlikely event that defendant's revised log remains deficient (in whole or in part), given well-settled law under Fed. R. Civ. P. 26(b)(5), the court will be strongly inclined to deem the particularly asserted privilege or protection waived – something the undersigned magistrate judge as a general proposition strives to avoid.  And if the court later gets dragged into an *in camera* review of documents listed on that revised log and finds that defendant's assertion of privilege or protection is clearly invalid under the case law cited in this order, the undersigned also will be strongly inclined to impose stiff sanctions (not just monetary ones) under Fed. R. Civ. P. 26(g).

IT IS THEREFORE ORDERED that plaintiff's motion is denied in part and granted in part for the reasons stated above.  Defendant's work-product objection is sustained as to Category 2.  For the remaining categories, the court defers ruling until it reviews a revised privilege log.

IT IS FURTHER ORDERED that by **May 29, 2020,** defendant shall produce, without objection, all of the above-referenced documents it previously asserted would be produced voluntarily.  By the same date, defendant shall produce a revised privilege log with any entries for which it maintains its objections.

IT IS SO ORDERED.

Dated May 15, 2020, at Kansas City, Kansas.

 s/ James P. O'Hara

James P. O'Hara
U.S. Magistrate Judge